## J. H. LUCIA, ON BEHALF OF HIMSELF AND ALL TAXPAYERS OF THE VILLAGE OF MONTPELIER, v. THE VILLAGE OF MONTPELIER, THE BOARD OF BAILIFFS, THE BOARD OF WATER COMMISSIONERS, AND F. L. EATON, TREASURER.

[IN CHANCERY.]

*Municipal Corporation. Village.*

1. When the legislature delegates to an incorporated village power, without limitation, to supply itself with water for fire and domestic uses, such power rests in the discretion of the voters of the village in respect to the amount of money to be expended on aqueducts and the supply of water, if exercised in good faith and for a proper municipal purpose.

2. And in such case, when a village has constructed one water main, it was held to be a question of expediency for the voters to decide whether another should be built; and an injunction was refused restraining the expenditure of money voted for that purpose, although the water in the existing main was used to some extent in running motors, and afforded a fair supply of water, if no accident befell it, and although some of the voters were influenced by a desire for an increase of motive power, but the concrete vote was given for the purpose of rendering the water supply more useful and certain.

BILL IN CHANCERY. Heard on the pleadings and testimony, March Term, 1888, ROWELL, Chancellor. The court *pro forma* and without hearing decreed that the defendants be perpetually enjoined from laying the water main mentioned in the bill, and that said Eaton be perpetually enjoined from hiring any money on the credit of the said village for the purpose of paying the expenses of the same.

The bill set forth, among other things:

" That heretofore, to wit, in the year 1855, the legislature

of the State of Vermont incorporated the village of Montpelier; that the act of incorporation is numbered 89 of the Session Laws of 1855; that at the biennial session of the legislature of the State of Vermont in 1872, said act of incorporation was amended by an act numbered 257.

"That section one of this last-named act is as follows: 'Section 1st, The second section of the act of incorporation of the village of Montpelier is hereby so amended as to authorize said corporation to purchase the right to take water from the outlet of Berlin Pond or such other place as said corporation may desire, and convey said water in suitable aqueducts and pipes to said village, and then distribute the same through said village in aqueducts and pipes for the extinguishment of fires and sanitary purposes, and for the use and convenience of the inhabitants of said village, and receive and collect such rents for the use of water as shall be agreed upon by the parties.'

"That section six of the act last named is as follows: 'Section 6th. Said village is hereby authorized to issue bonds to an amount not exceeding $50,000 on such terms as such village shall prescribe for carrying into effect the foregoing provisions.'

"That although said corporation is authorized by section one of its original charter to lay a tax on the polls and ratable estate of said village for the purpose mentioned in said charter, yet said corporation is not empowered to borrow money in any way except by said section six, hereinbefore set forth; that the village of Montpelier was duly organized and has acted as a corporation for more than twenty years last past; that in the year 1884, the village of Montpelier purchased the right to take water from the outlet of Berlin Pond, and either purchased or otherwise procured the right to construct a reservoir and aqueduct to convey the water to the village of Montpelier.

"That the reservoir was constructed on the brook flowing out of Berlin Pond about two miles distant from said village, and a large iron pipe laid to conduct the water from said reservoir to said village, and the water is conducted in iron pipes of different sizes through said village for the extinguishment of fires, sanitary purposes and all the ordinary uses for which water is used.

"That said aqueduct and reservoir are well and permanently built, and of ample size, so that sufficient water will flow through the same for the extinguishment of fires, sanitary and

Lucia *v.* Eaton.

domestic purposes at all times, and is in every way suitable for the wants of the inhabitants of said village, and large enough for the prospective needs of said village, and will afford sufficient water for all the purposes contemplated in said charter, when said village shall contain six times its present number of inhabitants.

"That the village of Montpelier issued its bonds and sold the same in the market in the sum of $50,000, as authorized by its charter, to aid in constructing said aqueduct, which bonds are now outstanding, and that sum not being sufficient to complete the same, raised by tax about the sum of $15,000, which has been expended in and about completing the same.

"That at the time of the making of the plans and of the construction of said aqueduct it was not contemplated by those having the direction of construction and estimates that the water brought in said aqueducts could be used for power, and the estimates did not contemplate such use, but after its construction, there being a large surplus of water, supplied by said aqueduct, not wanted for public use, or used for other purposes, it was found that by reason of the great height of the reservoir above the village that such surplus water could be used in running motors, and a large number have been put in of various sizes by the inhabitants of said village, and such power has been rented for a sum much less than such power could be obtained in any other way.

"That at the biennial session of the legislature of the State of Vermont, in the year 1884, an act was passed amending the charter of the village, and said act is numbered 212 of the Session Laws of 1884.

"That there being more persons living in the village of Montpelier who desire water for power at low rates, and others wishing to induce people to engage in business in Montpelier, propose to furnish them power by laying another aqueduct or main from said reservoir to the village of Montpelier; and accordingly a meeting of the voters of said village was called on the 26th day of September, A. D. 1887, at which time certain votes were passed under article one in said warning, which were as follows:

"1st. To see if the village will vote to lay another main water pipe from the reservoir, so-called, in Berlin, to some convenient point in said village, and to provide ways and means to defray expenses of the same.'

"At the meeting aforesaid the following votes were passed,

Lucia *v.* Eaton.

viz.: 'Moved by A. J. Sibley, that the village shall vote to lay another main water pipe from the reservoir in Berlin to some convenient point in said village, which motion was carried by a rising vote, 159 yeas, 12 nays.'

"On motion of C. H. Heath, the proper officers were directed to carry out the vote taken under article one of the warning.

"On motion of F. L. Eaton, the treasurer was authorized to borrow a sum not exceeding $30,000 to defray the expense of laying the pipe as provided in article one of the warning.

"That the sole purpose of putting in said second main from the reservoir to the village of Montpelier, is to provide power for individuals or corporations, and the water to be conveyed in the same is not needed for public use or purposes; that the village of Montpelier has no means of paying the proposed expense of the additional water main except by taxation."

The prayer was for a temporary injunction restraining the defendants "from entering into any contract with any person or persons for pipe to lay the main water pipe mentioned in the foregoing bill of complaint, and from incurring any expense on behalf of the village of Montpelier toward constructing a main water pipe from the reservoir to the village of Montpelier as provided in the vote of said village, on the 26th day of September, A. D. 1887, and that the said F. L. Eaton, treasurer of the village of Montpelier, be restrained from borrowing any money on the credit of said village for the purpose set forth in said vote of September 26th, 1887, until the further order of the court, and that on hearing, said injunction be made perpetual." The other facts appear in the opinion.

*Senter & Kemp* and *Pitkin & Huse*, for the defendants.

The village of Montpelier, under its charter, section 2, has a right to provide à water supply for its inhabitants (33 Vt. 277), though it could not without authority granted by the legislature exercise the right of eminent domain. *Rome* v. *Cabot*, 28 Ga. 40; *Livingstone* v. *Pippin,* 31 Ala. 542; Dill. Mun. Corp. s. 371.

The village, in its vote of September 26th, 1887, to lay an-

Lucia v. Eaton.

other main water pipe from the reservoir in Berlin to some convenient point in the village, was in the exercise of a proper municipal function of which it was the proper and sole judge. The record of that vote is the only proper proof of what it was. *Britt* v. *Cabot*, 36 Vt. 349. The vote of September 26th, 1887, was a legislative act on the part of the village. *Railroad* v. *City of New York*, 1 Hilton, 562, 588. And as to the legislative acts and discretion of the higher legislative bodies, the motives and the intent of individual legislators are not subject matter for judical inquiry. " The acts of a state are subject to still less inquiry, either as to the act itself or as to the reason for it." *Doyle* v. *Continental Ins. Co.* 94 U. S. 533, 541; *Kountze* v. *Omaha*, 5 Dillon, 443; *Wright* v. *Defrees*, 8 Ind. 298, 302; *Goddin* v. *Crump*, 8 Leigh, 120, 156; *Railroad Co.* v. *Cooper*, 33 Pa. St. 386; *Johnson* v. *Higgins*, 3 Mot. (Ky.) 476; *People* v. *Draper*, 15 N. Y. 555; Cooley on Con. Lim. 222; 2 Dill. Mun. Corp. s. 601.

And as to municipal action and discretion the same rule prevails, and their action is conclusive when the subject matter is within the delegated legislative powers. 1 Dill. Mun. Corp. s. 94; *Livingstone* v. *Pippin*, 31 Ala. 542; *Spalding* v. *Lowell*, 23 Pick. 71–80; *Hovey* v. *Mayo*, 43 Me. 322, 334; *R. R. Co.* v. *New York*, 1 Hilton, 562, 588; *Des Moines Gas Co.* v. *Des Moines*, 44 Iowa, 505; *Meth. E. Church* v. *Baltimore*, 6 Gill, 391, 400; *Williams* v. *School District*, 33 Vt. 271; *Eddy* v. *Wilson*, 43 Vt. 362.

It is not for the court to dictate to the village how it shall spend its money, unless the authority of the representatives of the citizens has been exceeded. *Torrent.* v. *Muskegon*, 47 Mich. 115. No principle of law is more solidly established than that when, in the honest and legitimate pursuit of a lawful object, a municipality obtains a water supply, it need not let the excess thereof run to waste, but may put it to profitable use. *State* v. *Eau Claire*, 40 Wis. 533; *Canal Co.* v. *Water Power Co.* 35 N. W. R. 529, 534, cited in *Bell* v. *Plattville*, 63 N. W. R. 831.

Lucia *v.* Eaton.

*S. C. Shurtleff*, for the orators.

It is for the court to determine upon the evidence whether any given enterprise is a public or private undertaking, so as to authorize a corporation to engage in it by taxing its citizens. *Tyler* v. *Beacher*, 44 Vt. 148.

The village is not the sole judge of the amount of water requisite for public purposes. If this proposition is as claimed by the defendants, then, if there is one public purpose named, the village is unlimited in the amount and number of pipes or aqueducts it may lay or the amount it may expend and tax its inhabitants for, though in fact very little is used or needed for public purposes, and under cover of one lawful expenditure, any number of private enterprises may be carried on. Can things be thus done indirectly which cannot be done directly?

The reasonable rule seems to be that in this case, the village was authorized to take all the water needed for public purposes, and in this outlay it had a right and it was its duty to take into consideration the prospective needs of the village; that is, make such an aqueduct as would supply the present and prospective needs of the village amply, for all public purposes and when the aqueduct was built, all the water not presently needed for public purposes can be used for other purposes until such time as it should be needed for public purposes. It might as well be said that a man should provide himself with two houses instead of one; or that a town should build two bridges, because it might happen that one would be carried off.

This is not the exercise of that *honest discretion* in doing what the village had a right to do, as is mentioned by the court in *Greenbanks* v. *Boutwell*, 43 Vt. 207; but it comes clearly within what the court say in that case would be a pretext of a lawful purpose to do what it had no legal right to do.

Villages and towns have no right to incur debts, or levy taxes to aid or encourage private or corporation enterprises for manufacturing or mining. The leading case on this subject is

*Citizens' Savings & Loan Association* v. *Topeka*, 20 Wall. 655.

The cases are there all collected on this subject up to that time.

This question has twice been before the Supreme Court of the United States, and the same principle re-affirmed. *Parkersburg* v. *Brown*, 106 U. S. 500; *Cole* v. *La Grange*, 113 U. S. 6; *Tyler* v. *Beacher*, 44 Vt. 648.

The opinion of the court was delivered by

POWERS, J. This is a bill in equity brought by sundry taxpayers in the village of Montpelier to arrest the expenditure of municipal funds for a proposed extension of the water supply of said village.

The facts established by the evidence, are, briefly stated, as follows: Prior to September 26, 1887, the village of Montpelier had at great expense and by virtue of its chartered authority, secured the right to take water from Berlin Pond to supply the wants of its inhabitants for domestic and public purposes. The supply thus secured largely exceeded the present · wants of the village, and the excess owned by the village was running to waste. The main pipe conducting the water to the village crosses the Winooski river and is exposed to damage, if not breakage, by the breaking up of the ice and floating of floodwood in the spring of the year. The water has been used to some extent as a power in running motors in the village, from which use a considerable revenue has been earned.

· The village is very compactly built, and a large fire threatens more damage to property than it would were the buildings more isolated or scattered. The water supply, however, is sufficient for ordinary fire exposure.

The voters of the village, at a legal meeting held on the 26th day of September, 1887, voted by a large majority to lay another water main from the village reservoir in Berlin to the village and authorized a loan of $30,000 to defray the expense.

Lucia v. Eaton.

The bill in this case seeks to restrain this expenditure, the orators insisting that the additional main is not wanted for any proper municipal purpose within the chartered power of the village, but primarily to supply additional power to run machinery, and the defendants insisting that the primary purpose is to render the supply of water more secure in case of injury to the original main, and more ample in case of an extraordinary fire. The defendants furthermore insist that inasmuch as the village owns an excess of water beyond the capacity of its reservoir, it has the right to use the same for manufacturing purposes even if it subserves no proper municipal end beyond the earning of income for the village. In support of the last proposition the defendants cite the cases of *State* v. *Eau Claire*, 40 Wis. 533; *Canal Co.* v. *Water Power Co.* 35 N. W. R. 529; and *Bell* v. *Plattville*, 36 N. W. R. 831.

We have no occasion to consider the soundness of this last claim of the defendants, as we are all agreed that the evidence warrants the expenditure on grounds clearly within the charttered power of the village.

The legislature delegated to the village the *power* to supply itself with water for fire and domestic uses. It left the exercise of this power to the discretion of the voters. It fixed no limits to the expenditure and set no bounds to the supply. It presented no system and devised no plan for adoption. It left the entire legislative function involved to the judgment of the village. The village, for aught that appears, in good faith in the exercise of its power, adjudges that its fire exposure demands a water supply that is beyond all danger, so far as possible, of failure, both under ordinary and extraordinary contingencies, and that its supply for ordinary domestic uses shall not be cut off by any failure in the original main.

It is very clear upon the authorities that a purpose to forefend against possible dangers to its water supply is both a dictate of prudence and of duty. The question whether it be wise to incur the expense proposed does not address itself to

the court. We have only to consider the question of power. The legislature left the question of expediency to the village, not to us. The *power* existing, the manner and extent of its exercise as determined by its custodian, must be held legal, until it is seen that it is perverted to wrongful ends or diverted to wrongful uses. The fact that while a proper municipal purpose is answered by laying an additional main, an incidental improper purpose is subserved, does not invalidate the action of the village, provided, in good faith, the primary purpose of the expenditure is to perfect its water supply generally, and the additional motive power gained, is a mere sequence of its action.

Suppose the village had deemed it wise at the outset to lay two mains instead of one in order to secure an uninterrupted flow of water in case either failed, would it be seriously claimed that it had exceeded its chartered power? If such action were warrantable then, it is warrantable now. The power was not exhausted in the first attempt at its exercise. The power given the village was to take water from Berlin Pond for municipal uses. If by the growth of the village the first draft upon the supply becomes inadequate for its legitimate wants, may it not be enlarged?

If the first method of supply, though ample, is exposed to hazards, that threatens its continuance, it is quite clear that it may be perfected by any means that will secure the end for which the power was given.

That the original main afforded a fair supply, if no accident befell it, we can easily see; and that some individual voters desired quite as much, at the meeting of September 26th, to obtain an increase of motive power, as a more certain water supply for ordinary municipal purposes, we can well believe; still we are satisfied from the facts shown that the concrete vote of that meeting had its foundation in a purpose and desire to make the water supply of the village for all uses to which it might be subjected under the charter, more ample, more useful and more certain.

This being so, it is a question of judgment upon a proposed municipal expense for a legitimate purpose which under the law addresses itself to the voters of the village and not to the courts. 1 Dill. Mun. Corp. s. 94; *Spaulding* v. *Lowell*, 23 Pick. 71; *R. R. Co.* v. *New York*, 1 Hilton, 562; *Bates* v. *Bassett, ante*, p. 530.

The decree is reversed and the cause remanded to the Court of Chancery with a mandate to dismiss the bill with costs.