2003 VT 62

**Andrew COURCHESNE and A.J.C. Construction, Inc. v. TOWN OF WEATHERSFIELD**

[830 A.2d 118]

No. 02-453

¶ 1. June 30, 2003. Plaintiffs appeal the decision of the Windsor Superior Court granting summary judgment to defendant Town of Weathersfield, a Vermont municipality, on plaintiffs' claims that the Town acted illegally and tortiously interfered with a business relationship. The court determined that the Town was entitled to sovereign immunity for its actions because it did not exceed the scope of its authority when it leased a gravel pit and entered into a gravel pit management agreement. We affirm.

¶ 2. Plaintiff Andrew Courchesne was, at all relevant times, the sole shareholder and sole employee of plaintiff A.J.C. Construction, Inc., a construction and trucking company engaged in the hauling of sand for winter road maintenance. This case arises from plaintiffs' contention that as a result of the actions of the Town of Weathersfield, plaintiffs were no longer engaged to haul sand from Weathersfield to the Town of Springfield sand shed.

¶ 3. During the 1997-1998 winter season, the owners of the Maple Street Gravel Pit in Weathersfield hired plaintiffs to haul winter sand from their gravel pit to the Town of Springfield. Springfield made all payments for the sand directly to the owners who in turn com-

pensated plaintiffs for the hauling. For more than one year prior to the winter of 1997-1998, the Town of Weathersfield was engaged in negotiations with the owners of the Maple Street Gravel Pit for the exclusive rights to extract sand, gravel, rock, and any other byproduct from the pit. The Town wanted to secure a source of gravel for highway purposes so that it did not have to continue buying gravel from a third party. On October 14, 1998, the owners of the pit executed a Sand and Gravel Extraction Agreement that granted the Town of Weathersfield the exclusive right to extract sand, gravel, rock and any other byproduct from the Maple Street pit for twenty-five years in consideration of the payment of $250,000, which was subject to a ratification vote. On March 2, 1999, the Town's legal voters approved an appropriation of $25,000 per year for ten years to the owners of the pit in exchange for the extraction rights.

¶ 4. While the Town of Weathersfield was engaged in negotiations with the pit owners, the Town became aware of the need to extract a great deal of sand to get to the gravel. The Town was not interested in obtaining this sand, however, because it was of a low grade and the Town already had a supply of higher quality sand from a sandpit on Route 5 in Weathersfield. Because the Town did not need or want the sand, the Town attempted to contract with Springfield to supply Springfield's winter sand from the Maple Street pit. Despite early negotiations between the Town and Springfield, the Springfield selectboard did not enter into an agreement with the Town regarding the sand supply.

¶ 5. Once the Town learned that Springfield would not obtain the sand, the Town entered into the Maple Street Gravel Pit Management Agreement with Jarvis and Sons, Inc. so that it would not have to hire employees to work at the pit. Under the management agreement, Jarvis agreed to manage the pit in compli-

ance with all permits for three years and to pay the Town $30,000 in exchange for the right to sell all sand and limited quantities of gravel. Springfield eventually purchased winter sand from Jarvis in early 1999, which Jarvis hauled from the Maple Street pit to the Springfield sand shed.

¶ 6. Springfield also continued to purchase sand from a different supplier, which plaintiffs hauled for the remainder of the 1998-99 winter season. At no time did the Town of Weathersfield ever have a contractual relationship with Springfield for the supply or hauling of winter sand. Springfield made all payments directly to Jarvis for sand from the Maple Street pit during the 1998-99 season. Springfield did not, at any time, have an exclusive arrangement with a supplier, including plaintiffs, for the hauling of winter sand.

¶ 7. In December 2000, plaintiffs filed this lawsuit against defendant Town alleging that the Town illegally interfered with their contractual relations with Springfield. Both parties filed motions for summary judgment, and on September 6, 2002, the court granted summary judgment to the Town on the basis of sovereign immunity. This appeal followed.

¶ 8. In reviewing a grant of summary judgment, this Court applies the same standard used by the trial court. *Peters v. State*, 161 Vt. 582, 582, 636 A.2d 340, 340 (1993) (mem.). Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." V.R.C.P. 56(c)(3).

¶ 9. The common-law doctrine of municipal sovereign immunity dates back to the mid-1800s in Vermont. *Graham v. Town of Duxbury*, 173 Vt. 498, 499, 787 A.2d 1229, 1232 (2001) (mem.). Under this doctrine, municipalities are pro-

tected from tort liability in "cases where the municipality fulfills a governmental rather than a proprietary function." *Id.*; see *Morway v. Trombly*, 173 Vt. 266, 270, 789 A.2d 965, 968 (2001) (absent a legislative decision "to fashion a more reasonable and workable doctrine," Vermont continues to use the "governmental-proprietary distinction") (internal quotation marks omitted). On appeal, plaintiffs argue that, in granting Jarvis an exclusive right to control and haul sand from the Maple Street pit, the Town's actions were proprietary in nature, and not governmental, and thus the Town should be liable in tort like any private entity if the foreseeable effect was to destroy plaintiffs' business. We disagree.

¶ 10. A municipality may exercise those powers and functions specifically authorized by the Legislature, as well as those functions that may be fairly and necessarily implied or that are incident or subordinate to the express powers. *Town of Brattleboro v. Nowicki*, 119 Vt. 18, 19-20, 117 A.2d 259, 260 (1955). We have previously held that the operation of a gravel pit by a town could be a function that was both incident and subordinate to the town's statutory duty to keep its highways in repair. *Hinesburg Sand & Gravel Co. v. Town of Hinesburg*, 135 Vt. 484, 486, 380 A.2d 64, 66 (1977). Although a gravel pit operation may be for public use, it may not be "'set up as a mere pretext to conceal a private purpose.'" *Id.* (quoting *Bates v. Bassett*, 60 Vt. 530, 536, 15 A. 200, 202 (1888)).

¶ 11. In *Hinesburg Sand & Gravel*, we found that the town's operation of the gravel pit was beyond the scope of its authority where the town processed and sold eight times more gravel for private sale than it used for public purposes, resulting in a $30,000 annual profit. *Id.* Thus, it could not be said that this "activity of a grossly commercial nature" was a legally authorized activity or one that was incident or subordinate to a statutory duty. *Id.* at 486-87, 380 A.2d at 66.

The case at bar does not confront us with such a "proprietary" situation. Unlike the situation in *Hinesburg*, the Town here did not realize a pecuniary benefit from the arrangement with Jarvis. Allowing Jarvis to sell the unwanted sand it had to dig through in order to extract the gravel was also reasonably related to obtaining the gravel for municipal purposes. See *id.* at 486, 380 A.2d at 66 (stating that a town's "[i]ncidental sale of a by-product (such as screened-out rock) to others could also be justified"). Accordingly, *Hinesburg* does not compel reversal.

¶ 12. Since this Court's decision in *Hinesburg Sand & Gravel*, the Legislature has expanded the powers granted to municipalities and specifically included, as part of the duty to maintain highways, the authority to contract with a private agency for services. 19 V.S.A. § 304(a)(3) (added 1985, No. 269 (Adj. Sess.), § 1). Section 304 of Title 19 directly authorizes the town selectboard to "purchase tools, equipment and materials necessary for the construction, maintenance or repair of highways ... [and to] contract with governmental or private agencies for the use of tools, equipment, road building material, and services." *Id.* § 304(a)(3). Here, in lieu of hiring additional town employees to operate the gravel pit, the Town contracted with Jarvis for its services, a power specifically granted to it by the Legislature. This Court has "only to consider the question of [a municipality's] power.... The *power* existing, the manner and extent of its exercise as determined by its custodian, must be held legal, until it is seen that it is perverted to wrongful ends or diverted to wrongful uses." *Lucia v. Village of Montpelier*, 60 Vt. 537, 545, 15 A. 321, 325 (1888) (emphasis in original) (ruling in favor of the municipality in a case involving an attempt by a group of taxpayers to enjoin a municipality from spending funds on the construction of a water main). If the primary object of a town's actions is not to attain a public

municipal purpose but to promote some private end, the action is not legally authorized, but if the primary object is to serve a public purpose, the action is legal notwithstanding some incidental gain that standing alone would not be lawful. *Bates*, 60 Vt. at 535, 15 A. at 202 (recognizing the incidental right of a town to rent part of its town hall and explaining that a "town has no right as a primary purpose to erect buildings to rent, but if in erection of its hall for its proper municipal uses, it conceives that it will lighten its burdens to rent part of its building whereby an income is gained, no sound reason is suggested why it may not do so").

¶ 13. The Town had the power to contract with Jarvis for management services in order to produce the gravel necessary for the Town's statutory highway maintenance duties. Its primary objective for entering into the gravel pit agreements was to serve a public, governmental purpose; the gravel pit management agreement was not set up as a pretext to conceal a private, proprietary use. Having determined that the Town acted within the authority granted to it by the Legislature, we may not question the prudence of the Town's decision. See *Lucia*, 60 Vt. at 544-45, 15 A. at 325. The Town's actions were governmental in nature, and within the scope of its sovereign immunity. The trial court's decision granting summary judgment for the Town was sound.

*Affirmed.*