2012 VT 84

# Eitan Sobel and Vered Sobel v. City of Rutland

[60 A.3d 625]

No. 11-436

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed October 12, 2012

Motion for Reargument Denied November 1, 2012

*Eiten Sobel* and *Vered Sobel*, Pro Ses, Rutland, Plaintiffs-Appellants.

*John T. Leddy* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan*, Burlington, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiffs, Doctors Eitan and Vered Sobel, owners of a medical office building in Rutland, appeal the superior court's grant of summary judgment for defendant, City of Rutland. Plaintiffs sued the City for damages, claiming the City Tax Assessor (the Assessor) was negligent in providing allegedly inaccurate property tax estimates on the proposed, but not yet built, office. Plaintiffs also sought to enjoin the City from enforcing the tax assessment on the office building ultimately constructed. On appeal, they argue that the court erred in concluding that their negligence claim was barred by municipal immunity and that they failed to establish equitable estoppel against the City. We affirm.

¶ 2. The undisputed facts may be summarized as follows. In October 2008, plaintiffs bought a residential property with the goal of establishing a medical practice on the lot. Soon thereafter they contacted the Assessor by telephone when, as they characterized it, "nothing was concrete" and they were "trying to start playing with plans." Plaintiffs followed up on this telephone

conversation with a series of emails. According to plaintiffs, they approached the Assessor strictly in his official capacity, although they knew he was not obligated to offer tax estimates.

¶ 3. In the first email to the Assessor in December 2008, plaintiffs advised of a plan to construct a 6000-square-foot building, but were also considering whether the building should be one or two stories tall. In the same email, plaintiffs indicated that they needed "to know in advance whether to go ahead and to build the second floor [and] hop[e] for 'better times.'" Plaintiffs asked for a tax estimate for both a one and two story building.

¶ 4. The Assessor replied to this first email as follows:

> I ran some different scenarios with the information you supplied. *Without the submission of detailed plans this is at best a very vague estimate.* That said, I considered a brick exterior building comprised of . . . 6000 square feet of unfinished area on the second floor. . . . The present land value comprising .72 acres is 47,200 and that would be the value as of April 1, 2009 assuming the building is not in place at that time. If the building was in progress of being built as of that date the assessment would reflect the value in place [on] that date. Upon completion, a *very cursory estimate* would be $772,700 land included. Using the present tax rate, the annual property tax would be $21,400. *I must advise you that these calculations are done per your request without having detailed plans with which to work. Accordingly these estimates could change. Once the building is complete and the assessment is established you will be granted all rights to appeal said value.* (emphases added).

The Assessor's reply also included a separate section estimating the "approximate value of 6000 square feet one story to be about $371,500 land included," but noting that this was "an estimate without any plans to go by."

¶ 5. In February 2009, plaintiffs wrote another email, which in pertinent part advised that they were "reconsidering the idea of building the office," and were considering the option of renting or building a smaller office. Without attaching any plans, plaintiffs asked for the estimated value of a one floor, 4500-square-foot building. The Assessor replied with an estimate of $243,000 for the building plus $47,200 for the land. Next, plaintiffs asked for the

yearly tax for this kind of building; the Assessor responded that, under the then current tax rate, the annual tax would be about $8050. Plaintiffs later explained they understood the estimates were "nonbinding," but "assum[ed] it could be 10 percent more, 10 percent less."

¶ 6. Plaintiffs applied for a building permit in July, estimating the cost of improvements to be $700,000. With the permit in hand, plaintiffs provided TD Bank with building plans, and in November the bank issued a mortgage on the property in the amount of $490,000 to finance construction. The existing structure was demolished and construction on the new building was completed before April 1, 2010. The final cost of construction was approximately $700,000.

¶ 7. The Assessor examines new construction on April 1 of each year, and inspected and assessed plaintiffs' property at $649,100, with $96,500 reflecting the value of the land and $552,600 reflecting the value of the new building. On June 26, 2010, the Assessor received an email from plaintiffs stating that they were "surprised to receive your l[e]tter of appraisal valuing the building as $649,100" because it was "2¼ times more than [the] original estimate." Plaintiffs protested that, while they understood the Assessor could not "provide a final appraisal until the building is finished, it should be much closer to the initial appraisal." The Assessor treated this email as an appeal of the assessed value and denied relief.

¶ 8. Plaintiffs appealed the Assessor's denial to the City's Board of Civil Authority (BCA), citing their interactions with the Assessor as the basis of their disputed valuation. Plaintiffs retained an appraiser who assessed their property at $575,000. The BCA held a hearing where plaintiff, Dr. Sobel, testified about the history of the Assessor's estimates and the ultimately different assessment. The BCA upheld the $649,100 assessment.

¶ 9. Plaintiffs next appealed to the State Director of Property Valuation and Review, complaining that "[u]nfortunately, once the building was completed, [the Assessor] increased his appraisal value. It was about 2.5 times more than his original estimate." After a hearing, the State Appraiser decided the value of the building was $516,700. Plaintiffs did not appeal the State Appraiser's decision.

¶ 10. Plaintiffs did, however, sue the City in April 2011 alleging negligent misrepresentation and equitable estoppel.* Plaintiffs complained that they relied on the Assessor's initial email estimate, which was a major factor in their decision on the type and size of the building constructed on the lot. The City moved for summary judgment arguing, as on appeal, that the undisputed facts failed to defeat the City's defense of municipal immunity, or support plaintiffs' claim of estoppel. Plaintiffs responded with a memorandum in opposition contending that the fact of the Assessor's knowledge of their reliance on his figures remained in dispute, and arguing the City's immunity claim failed as matter of law.

¶ 11. The superior court granted summary judgment for the City. Explicitly adopting the City's argument in its motion for summary judgment, the superior court held that the City was protected against suit by municipal immunity. The court explained that the Assessor's estimates arose from the City's governmental function of assessment and collection of taxes. The court further held that plaintiffs could not meet the elements of negligent misrepresentation or equitable estoppel. This appeal followed.

¶ 12. We review summary judgments under the same standard as the trial court. We will affirm if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Campbell v. Stafford*, 2011 VT 11, ¶ 10, 189 Vt. 567, 15 A.3d 126 (mem.). The nonmoving party is entitled to "the benefit of all reasonable doubts and inferences." *Id.* (quotation omitted). In the instant case, there is little dispute as to what happened, but much disagreement over the legal significance of the fact of the Assessor's tax estimate in terms of governmental immunity and whether the City is estopped, as a matter of equity, from assessing the property at actual market value.

¶ 13. We first address whether municipal immunity protects the City from plaintiffs' negligence suit arising from the Assessor's tax

---

* As noted in the City's motion for summary judgment, plaintiffs' complaint asked for damages, and did not explicitly invoke the doctrine of equitable estoppel. It did assert, however, that the Assessor was aware that plaintiffs would use his estimates to decide whether to pursue their planned construction, that the Assessor had enough information to provide a reasonable estimate, and that they would not have gone forward had they known the actual tax burden. The City, in its motion for summary judgment, couched plaintiffs' assertions under the rubric of equitable estoppel and argued that plaintiffs failed to meet the elements for estopping enforcement of the tax assessment.

estimates. Plaintiffs argue that the Assessor's estimations are a proprietary rather than a governmental activity, since his statutory duty of tax collecting carries no official obligation to estimate. Invoking our decision in *Marshall v. Town of Brattleboro*, 121 Vt. 417, 160 A.2d 762 (1960), plaintiffs further characterize the Assessor's estimates as proprietary insofar as their purpose was to help them start a medical practice that would serve the City and individual residents, and "did not benefit the public as a whole." Because we conclude that the Assessor's tax estimates are reasonably related to the governmental function of taxation, we hold that plaintiffs' negligence claim is barred by municipal immunity.

¶ 14. Municipal immunity protects municipalities "from tort liability in cases where the municipality fulfills a governmental rather than a proprietary function." *Courchesne v. Town of Weathersfield*, 2003 VT 62, ¶ 9, 175 Vt. 585, 830 A.2d 118 (mem.) (quotation omitted). Governmental functions are those performed when a municipality "exercise[s] those powers and functions specifically authorized by the Legislature, as well as those functions that may be fairly and necessarily implied or that are incident or subordinate to the express powers." *Id.* ¶ 10. Proprietary activities, on the other hand, are, essentially, commercial activities performed by a municipality in its corporate capacity, for the benefit of the municipality and its residents, and unrelated to its "legally authorized activity." See *Hinesburg Sand & Gravel Co. v. Town of Hinesburg*, 135 Vt. 484, 486-87, 380 A.2d 64, 66 (1977) (explaining that Town's activity of selling vast surpluses of gravel was "grossly commercial [in] nature" and quite beyond its governmental function of operating a gravel pit for town highway maintenance); *Marshall*, 121 Vt. at 425, 160 A.2d at 767 ("To be proprietary the benefit must accrue to the municipality in its corporate capacity.").

¶ 15. In *Courchesne*, for example, the Town of Weathersfield hired a private business to manage a gravel pit leased by the Town to secure a source of gravel for its highways. 2003 VT 62. Per its agreement with the Town, the business was allowed to sell sand that covered the gravel, for which the Town had no use. We concluded, under those facts, that the Town had not engaged in a proprietary activity, reasoning that the Town derived no monetary benefit from the arrangement and that allowing the business to sell the unwanted sand was "reasonably related to obtaining the gravel for municipal purposes." *Id.* ¶ 11.

■ ¶ 16. Here, the Assessor's tax estimates were ancillary and related to governmental functions for which the City is entitled to municipal immunity. The City's assessment and collection of taxes is a core governmental function. See 24 V.S.A. App. ch. 9, § 8.5 (providing that Rutland Board of Alderman shall assess taxes required by state law and other municipal purposes). Pursuant to the City's charter, and as defined by state law, the Assessor is responsible for examining real property and appraising its fair market value for the purpose of assessing a tax on the property. See *id.* § 13.1 (stating that the city assessor shall exercise the duties of listers); 32 V.S.A. § 4041 ("On April 1 the listers shall proceed to take up such inventories and make such personal examination of the property which they are required to appraise as will enable them to appraise it at its fair market value."). Municipalities derive no income or similar commercial return from estimating taxes.

■ ¶ 17. Plaintiffs admit that the estimates here were sought from the Assessor in his official capacity; but for his office plaintiffs would not have inquired. Plaintiffs' argument that the Assessor had no municipal obligation to make estimates ignores the extension of municipal immunity to activities "fairly and necessarily implied," or "reasonably related" to functions of government. *Courchesne*, 2003 VT 62, ¶¶ 10-11 (citing *Town of Brattleboro v. Nowicki*, 119 Vt. 18, 19-20, 117 A.2d 259, 60 (1955)). Tax estimates elicited from the Assessor by putative taxpayers solely on account of the former's official position are not so remote or attenuated from his governmental duties as not to be "reasonably related" to his duties and the City's taxing authority. *Id.*

■ ■ ¶ 18. That the Assessor has no particular duty to provide such estimates, and that estimates have no impact on the ultimate assessment, does not reduce it to a proprietary activity. There was no municipal obligation to lease a gravel pit or hire a manager, rather than hire a hauler, to supply road gravel in *Courchesne*, but the municipality's decision to do so was not a proprietary action since it was "incident or subordinate" to its function to maintain roads. *Id.* ¶ 10. Gratuitous estimates may not be literally "necessary" to the City's taxing power, but estimating cannot be reasonably characterized as not related, incident or subordinate to assessing value for purposes of taxation. Nor did the Assessor's

estimates represent any commercially gainful activity for the municipality, as required for proprietary liability in *Hinesburg Sand & Gravel*, to distinguish this case from the application of municipal immunity in *Courchesne*. Such estimates inform residents of the potential tax consequences of planned construction that will be subject to eventual inspection, appraisal and assessment by the City — all within, incidental or related to a municipality's taxing authority. Thus, tax estimates provided in response to citizen inquiry are reasonably treated as governmental, as opposed to proprietary, activity and the City is immune from suit stemming from the Assessor's estimates.

¶ 19. We next address whether, under the doctrine of equitable estoppel, the City should be foreclosed from enforcing the tax assessed on plaintiffs' property. Plaintiffs concede that the Assessor's estimate was based only on limited facts known and supplied at the time, and therefore that some difference between the estimate and the assessment could be expected. However, plaintiffs' claim that the Assessor, with knowledge of the property's location and approximate specifications, as well as the value of comparable properties, possessed enough facts to provide a "reasonable" estimate and that the estimates provided "were grossly out of range." As a result, plaintiffs contend that the City should be bound to a tax assessment within ten percent of the Assessor's estimate. Moreover, plaintiffs assert that their reliance on the estimates was reasonable in light of the Assessor's knowledge that their decision to move forward with the construction depended on whether they could afford the property's future tax.

¶ 20. We conclude, however, that plaintiffs cannot establish the elements of equitable estoppel on these facts. Estoppel requires that the party invoking the doctrine establish

> four essential elements: (1) the party to be estopped must know the facts; (2) the party being estopped must intend that its conduct be acted upon; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the conduct of the party to be estopped to its detriment.

*Town of Victory v. State*, 174 Vt. 539, 540, 814 A.2d 369, 372 (2002) (mem.). Moreover, the reliance asserted must be reasonable. *Vermont Structural Steel v. State*, 153 Vt. 67, 74, 569 A.2d 1066,

1070 (1989). The party asserting estoppel has the burden of establishing all of its elements. *Id.* at 73, 569 A.2d at 1069.

¶ 21. Plaintiffs did not show below that the Assessor intended his estimates to be relied upon, or that their reliance on the estimates was reasonable. Assuming, as plaintiffs maintain, that the Assessor knew they did not want to construct a building that would cost them more than $10,000 in annual property taxes, such knowledge would not render his estimates any more reliable or binding than expressly disavowed by the Assessor. Regardless of his understanding of plaintiffs' plans, the Assessor's response to their initial inquiry explicitly disclaimed the accuracy and finality of his estimates, emphasizing that they were made "without having detailed plans," and that the estimates were "vague" and "could change." All of the Assessor's subsequent estimates were given in this context, and no evidence supports the notion that the Assessor intended for plaintiffs to rely on the hypothetical, vague, and changeable valuations.

¶ 22. Nor, in the face of the same disclaimers, could plaintiffs prove that their claimed reliance on the estimates was reasonable. There was no evidence that the Assessor was, or should have been, aware of plaintiffs' presumed "ten percent" rule of accuracy. Plaintiffs' effort to impute that standard into their dealing with the Assessor is unavailing. According to their complaint and deposition, no such ten percent expectation was imparted to or discussed with the Assessor. Instead, the standard was borrowed, later, from affirmative governmental commerce regulations limiting charges to consumers to 110% of job costs estimated by interstate moving vans in the United States and automotive repair shops in Ontario, Canada. On this record, and absent any authority to the contrary, it cannot be said that the trial court erred in declining to consider the ten percent standard here, in a circumstance entirely divorced from commercial regulation. Because plaintiffs cannot establish these aspects of estoppel, the remaining elements require no discussion, and their claim fails.

*Affirmed.*