2008 VT 64



Grice v. Vermont Electric Power
Company, Inc. (2006-352 & 2006-510)

 

2008 VT 64

 

[Filed 16-May-2008]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40
as well as formal revision before publication in the Vermont Reports. 
Readers are requested to notify the Reporter of Decisions, Vermont Supreme
Court, 109
 State Street, Montpelier, Vermont05609-0801
of any errors in order that corrections may be made before this opinion goes to
press.

 

 


 2008 VT 64
 
  


 Nos. 2006-352 & 2006-510
 
  


 Harley Grice, Individually and as
 Trustee of the
 
 
 Supreme Court
 
 
 Harley Grice Trust, Wendy Butler, Penny Curler
 
 
  
 
 
 and Heather Grice
 
 
 On Appeal from
 
 
  
 
 
 Addison
 Superior Court 
 
 
     v.
  
 
 
  
 
 
 Vermont Electric Power Company,
 Inc.
  
 
 
  
 
 
 In re Petition of Vermont
 Electric Power
 Company, Inc.
  
  
 
 
 On Appeal from
 Public Service Board
  
 November Term, 2007
  
  
 
 Matthew I. Katz, J. (06-352)

David C. Coen and John D. Burke,
Board Members (06-510)

 

James A. Dumont of Law Office of James A. Dumont, PC, Bristol, for Appellants
Grice, 

  et al. (06-510 &
06-352).

 

Kimberly K. Hayden of Downs Rachlin
Martin PLLC, St.Johnsbury,
and Joslyn L. Wilschek of

  Primmer Piper Eggleston & Cramer PC, Montpelier, for Cross-Appellants/Appellees
Vermont

  Electric Power Company, Inc. and Vermont Transco, LLC (06-510 & 06-352).

 

James H. Porter, III, Montpelier,
for Appellee Department of Public Service (06-510).

 

William H. Sorrell, Attorney General, and Bridget C. Asay, Assistant Attorney General,

  Montpelier, for IntervenorState of Vermont,
Office of the Attorney General (06-510 & 

  06-352).

 

David L. Grayck and Evan J. Mulholland of Cheney, Brock & Saudek,
P.C., Montpelier,
for

  Amicus Curiae The Meach
Cove Real Estate Trust (06-510).

 

 

PRESENT:  Reiber, C.J., Skoglund and Burgess, JJ., and
Gibson J. (Ret.), and Eaton, D.J.,

                    
Specially Assigned

 

¶ 1.            
REIBER, C.J.  These two related appeals involve a petition
by the Vermont Electric Power Company (VELCO) to condemn an easement for an
electrical-transmission line across the property of landowners, Harley Grice,
individually and as Trustee of the Harley Grice Trust, Wendy Butler, Penny
Curler and Heather Grice (the Grices).  The
Public Service Board granted VELCO’s petition to
condemn a strip of the Grice property, but denied VELCO’s
request to install excess fiber-optic capacity along the corridor. 
Concurrent to the Board proceedings, the Grices filed
a declaratory action in superior court challenging the Board’s statutory and
constitutional authority to condemn their property.  The court concluded
that the Board had constitutional and statutory authority.  The Grices appeal both the Board’s condemnation order and the
superior court’s judgment.  VELCO cross-appeals from the Board’s order
denying its request to add excess fiber-optic capacity to its transmission
line.  We affirm the superior court decision and the Board’s condemnation
order, but amend the Board’s order to allow VELCO to install the requested
fiber-optic capacity.

¶ 2.            
The procedural history and facts of the case are briefly as
follows.  VELCO initiated a plan to increase the capacity of the
electrical grid in Vermont
by installing along a thirty-five-mile corridor a 345 kilovolt (kV) electrical
line as part of the Northwest Reliability Project (NRP).  VELCO petitioned
the Board for a certificate of public good (CPG) and in January 2005, the Board
concluded that the NRP was necessary for the reliability of the electrical
system in Vermont
and issued a CPG.  See 30 V.S.A. § 248(a) (requiring an electric company
to obtain approval from the Board that a project “will promote the general
good” before beginning to construct a new transmission facility).  Several
parties challenged the Board’s decision to grant a CPG, and, on appeal, this
Court affirmed.  In re Vt. Elec. Power Co., 2006
VT 69, 179 Vt.
370, 895 A.2d 226.

¶ 3.            
Following the Board’s issuance of the CPG, VELCO attempted to negotiate
with the landowners along the proposed corridor, including the Grices, to obtain the necessary easements.  VELCO
already has a 150-foot-wide easement across the Grices’
land where an 115kV electric line is installed.  In September 2005, after
VELCO failed to reach an agreement with the Grices,
VELCO petitioned the Board to condemn a 100-foot-wide strip of the Grice
property, about a mile in length that would run parallel to the existing
lower-voltage easement.  VELCO asked for permission to remove so-called
“danger trees” outside of the easement and for access to the easement at all
points in the case of an emergency.  As part of its proposal, VELCO also
planned to install an optical ground wire (OPGW) cable across the easement with
seventy-two optical fibers to transmit data, and video and voice communication. 
VELCO explained that the OPGW cable would be used for internal communication
and was necessary to insure reliability of the line, but acknowledged that it
did not need all seventy-two fibers for internal communication.  VELCO
planned to trade any excess capacity to other communication service providers
in return for use of their capacity in other parts of the state where VELCO
does not have optical fibers and must pay for their use.

¶ 4.            
The hearing officer granted VELCO’s request
for condemnation, and for unlimited access to the easement.  The officer
concluded that it was necessary for VELCO to be able to reach the easement to
remove trees or restore power in the case of an emergency.  The hearing
officer denied VELCO’s request to install excess
capacity in the OPGW, concluding that this was not necessary for VELCO’s business of providing electrical services, and
therefore VELCO could not condemn the property for such a purpose.  

¶ 5.            
On appeal, the Board adopted the hearing officer’s findings, affirmed
the hearing officer’s conclusion that the easement was necessary, and granted
VELCO condemnation of the easement.  The Board also granted VELCO
unlimited access to the easement, concluding that it was necessary to maintain
reliability of the line in emergency situations.  The Board assessed
damages for the Grices at $25,000.  In response
to VELCO’s request to install excess capacity in the
OPGW, the Board concluded that VELCO was not authorized to sell, lease or
exchange excess capacity.  In a subsequent order clarifying this
conclusion, the Board specified that VELCO was not authorized to install all
seventy-two fibers because VELCO only needed twenty-four fibers to insure the
reliability of the line.  The Board reasoned that if VELCO could buy
capacity from other providers in other parts of the state then it was not
necessary to have excess capacity to trade.  

¶ 6.            
While the Board action was pending, the Grices
also filed an action for declaratory judgment in Addison Superior Court,
challenging VELCO’s statutory and constitutional
authority to condemn their land in a proceeding before the Board.  The Grices argued that the Board’s assertion of jurisdiction
violated its authorizing statute, was preempted by federal law and violated the
Vermont Constitution because the energy running through the transmission lines
would be regulated by federal, not state, law.  The superior court
dismissed the complaint, concluding that the condemnation action did not
violate any statute or the Vermont Constitution, and was not preempted by
federal law.  The Grices appealed.  The Grices also appealed the Board’s decision, challenging the
Board’s authority to adjudicate the condemnation action.  VELCO filed a
cross-appeal, arguing that the Board erred in not granting it the right to
install excess fiber-optic capacity along the easement.  We consolidated
the appeals from the Board and the superior court.

¶ 7.            
We review de novo the superior court’s decision interpreting the statute
and the Vermont Constitution.  Wright v. Bradley, 2006 VT 100, ¶ 6,
180 Vt. 383, 910 A.2d 893.  Our review of decisions from the Board
is more deferential; we defer to the Board’s “expertise and informed judgment,”
and “apply a strong presumption of validity” to its orders.  In re Verizon New England Inc., 173 Vt. 327, 334, 795 A.2d 1196, 1202 (2002). 
“Absent a compelling indication of error, we will not disturb an agency’s
interpretation of statutes within its particular area of expertise.”  Id. at 334-35, 795 A.2d at 1202.  With these standards in mind, we
turn to the issues on appeal.

I.

¶ 8.            
We first address the Grices’ claims in their
direct appeal.  In three related claims, the Grices
argue that the Board had no authority to grant VELCO’s
condemnation request because the condemnation action: (1) is contrary to the
Board’s statutory mandate, (2) is preempted by federal law, and (3) violates
Article 2 of the Vermont Constitution.  The Grices
also contend that if the Board did have authority to adjudicate the
condemnation action, the Board erroneously granted VELCO overly broad access to
the property.  Finally, the Grices request
attorney’s fees and expert witness costs.  We consider these claims in
turn.

A.

¶ 9.            
The Grices’ main argument on appeal is that
the resulting 345kV line will be regulated by federal law, not state law, and
it is beyond the Board’s authority to condemn property for a use that it will
not regulate.  In particular, the Grices argue
that the Board does not have statutory authority to grant condemnation unless
the Board will directly regulate the resulting use.  In assessing the Grices’ claim, we begin by examining the language of the
Board’s authorizing statute.  See In re Verizon New England, 173 Vt. at 335, 795 A.2d at
1202 (explaining that to give effect to the Legislature’s intent, we first
examine the plain meaning of the statute).  The statute authorizes the
Board to adjudicate condemnation of private land when it is “necessary” for a
public service corporation under the jurisdiction of the Board to acquire such
property or an easement to the property “that it may render adequate service to
the public in the conduct of its business.”  30 V.S.A. §
110.  Once a utility initiates a condemnation action, the Board may
grant the request if the Board finds that it is 

necessary in order
that the [utility] may render adequate service to the public in the conduct of
the business which it is authorized to conduct, and in conducting which it
will, according to the laws of this state, be under an obligation to serve the
public on reasonable terms, and pursuant to the regulations of the board.

 

Id. § 112.  

¶ 10.         The
Board made the required necessity determinations in this case.  First, the
Board generally concluded that the NRP is in the public interest and necessary
for the reliability of the electrical system in Vermont when it granted VELCO a CPG for the
project.  In re Vt. Elec. Power Co., 2006 VT 69, ¶ 21 (affirming
Board’s decision to grant a CPG); see Auclair
v. Vt. Elec. Power Co., 133 Vt. 22, 26, 329 A.2d 641, 644 (1974)
(explaining that issuance of a CPG is “a resolution” that the project is in the
public interest).  In addition, as related to the Grice property, the
Board determined that an easement across the Grices’
land is necessary for VELCO to complete the new line and provide adequate
service to the public.  See In re Vt. Elec. Power Co., 2006 VT 69,
¶ 18 (explaining that § 248 certification is a planning and policy
determination and does not predetermine the necessity of condemning particular
parcels of land).  

¶ 11.         On
appeal, the Grices do not challenge the Board’s
necessity determinations; rather, the Grices’
arguments rest on the language in the latter part of § 112 that requires a
petitioning company’s business to be “according to the laws of this state,
[and] be under an obligation to serve the public on reasonable terms, and
pursuant to the regulations of the board.”  30 V.S.A. §
112.  The Grices interpret this
requirement as authorizing the Board to adjudicate condemnation proceedings
only in cases where the energy passing through the lines will be directly
regulated by the Board.  VELCO is an electrical-transmission company that
transports power from other states into Vermont
and sells it wholesale to the retail companies who in turn sell the power to
individual consumers.  Because VELCO’s lines are
part of an interconnected interstate grid, the power moving through them is
regulated by federal law.  The Grices reason
that because the power from the new transmission line will not be regulated
directly by the Board, but by federal regulations, the Board does not have
authority to condemn their property.

¶ 12.         We
conclude that the Board properly exercised its authority to conduct
condemnation proceedings in this case.  The Board interpreted the
statute’s directive that a condemning company’s business must be conducted
“pursuant to the regulations of the board,” 30 V.S.A. § 112, as follows: “The
most reasonable construction of this requirement is not that the Board has
actually adopted regulations that apply to a particular company, rather that
the company, by law, is subject to such regulations as the Board may
adopt.”  We agree with the Board’s analysis, especially given our
deference to the Board’s interpretation of statutes within its area of
expertise.  See In re Verizon New England, 173 Vt. at 334-35, 795
A.2d at 1202 (deferring to the Board’s interpretation of statutes within its
area of expertise absent compelling indication of error).  The statute
does not require that the energy in the transmission lines be regulated by the
Board, but that VELCO be subject to the Board’s control and obligated to serve
the public interest.  An examination of the relevant statutes indicates
that both of these elements are met. VELCO is a public service corporation,
obligated to serve the public and subject to the Board’s oversight.  See, e.g., 30 V.S.A. §§ 102 (establishing process for a company to
become a public service corporation and providing that the Board can revoke the
status for good cause), 209 (granting the Board jurisdiction over “all matters
respecting” the business of a public service corporation). 
Moreover, the Board is empowered by statute to take action to insure the reliability
of VELCO’s transmission lines if it is in the
interest of the people of Vermont. 
Id. §§ 210 (granting the Board jurisdiction to order electric companies
to build or connect transmission lines if it is in the public good), 213
(empowering the Board to order an electrical-transmission company to transport
electric energy over its transmission lines “at a reasonable service charge”
and “in such manner as the board shall direct”).  Thus, “in the conduct of
[its] business,” VELCO is “under an obligation to serve the public,” and is
subject to the Board’s control.  Id. §
112.

¶ 13.         The Grices’ assertion that the statute is satisfied only if the
Board directly regulates the energy passing through the lines is an overly
narrow interpretation and at odds with the overall “reason and spirit” of the
law.  Wright, 2006 VT 100, ¶ 7 (quotation omitted) (explaining that
in cases where the statute’s plain meaning is not readily apparent, we examine
the entire statute and look to the overall purpose of the law).  The
purpose of the statute is to insure that land is condemned for public use and
remains subject to public control.  In this case, there was previously a
determination that construction of the new line is necessary for the public
good, In re Vt. Elec. Power Co., 2006 VT 69, ¶ 4, and, as indicated
above, VELCO is obligated to serve the public pursuant to the Board’s
control.  We find no merit in the Grices’
proposition that VELCO’s new transmission line will
not benefit Vermonters because the line may carry electricity to other
states.  Even if the new transmission line carries electricity to other
states at times of excess capacity over existing demand, the opposite is also
true.  The same transmission system of interconnected interstate lines
will necessarily bring electricity to Vermonters at times of need, and in an
emergency, the Board can require VELCO to do so.  See 30 V.S.A. § 213.

¶ 14.         Furthermore,
the Grices’ interpretation of the statutory language
is at odds with the overall statutory scheme.  Under the Grices’ interpretation of the statute, the Board can
entertain condemnation actions only if it then actively regulates every aspect
of the resulting use.  If this is true, then at no time would the Board
have jurisdiction to adjudicate condemnation actions for the wholesale
transmission of energy because, as discussed below, this energy is regulated by
federal law.  The statute, however, envisions transmission companies, as
well as energy retailers, using the power of eminent domain for the
construction of transmission lines to the benefit of the public.  See id.
§ 2802.  As the Board explained, if transmission companies condemn
property, “§ 2802 requires these companies to sell and furnish electricity
to the extent that the Board determines that this would be required by ‘the
public convenience or necessity.’ “  We agree
with the Board’s interpretation of the statute and conclude that the statute
authorizes condemnation in this case.

¶ 15.         Next,
we consider whether federal law preempts the Board’s authority to adjudicate
this condemnation action.  Federal law can preempt state law pursuant to
the Supremacy Clause, U.S. Const. art. VI, cl. 2.  In re Vt.Ry., 171 Vt. 496, 499-500, 769
A.2d 648, 652 (2000).  State law may be preempted either explicitly
by the language of a federal statute or implicitly by the federal statute’s
structure and purpose.  California ex rel. Lockyer
v. Dynegy, Inc., 375 F.3d 831, 849 (9th Cir. 2004); In re Verizon New
England, 173 Vt.
at 336, 795 A.2d at 1203.  A federal law implicitly preempts state
law either by field preemption—if the legislation demonstrates Congress’ intent
to occupy an entire field, or through conflict preemption—where Congress has
not entirely displaced state regulation in a particular field, but state law
actually conflicts with federal law.  Dynegy, 375 F.3d at 849; see In
re Verizon New England, 173 Vt.
at 336, 795 A.2d at 1203 (listing different types of preemption).  Where
the issue is not whether the federal government had authority to act, but
whether state action conflicts with and has been displaced by federal law,
there is a presumption that the power of the state is not superseded.  New York v. Fed. Energy Regulatory Comm’n, 535 U.S.
1, 17-18 (2002).  “The party seeking to overcome this
presumption bears a heavy burden.”  In re Vt.Ry., 171 Vt.
at 499, 769 A.2d at 652.  

¶ 16.         The Grices argue both forms of implicit preemption and first
submit that the Federal Energy Regulatory Commission (FERC) has exclusive
jurisdiction in the area of electrical transmissions and thus federal law
preempts state authority in the entire field.  The Grices
claim that FERC’s jurisdiction over interstate
wholesale electric transmission is “plenary” and “exclusive.”  See Dynegy,
375 F.3d at 849-51.  The opposite, however, is
true because federal law regulating energy transmission does not occupy the
entire field of energy regulation.  As the Supreme Court of the United States
concluded, FERC’s authorizing statute and its own regulations
have preserved state jurisdiction in several key areas pertaining to energy
transmission.  New York, 535 U.S. at
24.  The Court recognized “Congress’ intent to preserve state jurisdiction
over local facilities.”  Id. at
22.  Thus, we conclude that federal law has not wholly displaced
state authority in the regulation of transmission of electrical energy, and
examine whether any federal law conflicts with, and thus preempts, state
regulation over VELCO’s transmission lines.

¶ 17.         The Grices also argue that FERC regulations requiring open
access of transmission lines conflict with and therefore preempt state
law.  In 1996, FERC promulgated Order No. 888 entitled, “Promoting
Wholesale Competition Through Open Access
Non-Discriminatory Transmission Services by Public Utilities; Recovery of
Stranded Costs by Public Utilities and Transmitting Utilities.”  61 Fed. Reg. 21,540 (May 10, 1996).  The rule mandates
that all public utilities, which own, control or operate facilities used for
transmitting electric energy in interstate commerce, must file open-access
nondiscriminatory transmission tariffs.  VELCO is a provider of
electricity transmission and pursuant to these regulations, has already filed a
tariff with FERC.  Because FERC regulates the terms and conditions of the
sale and transmission of wholesale energy in the 345kV line, the Grices argue that federal law preempts state control of VELCO’s transmission.  

¶ 18.         The
Board concluded that, notwithstanding federal control over rates for the sale
of interstate-transmission services, open access to the VELCO transmission
system and the reliability of interstate-transmission service, these elements
of specific control did not conflict with the Board’s responsibility under Vermont law to control
electrical facility siting.  We agree. 
Electricity in almost the entire continental United States is integrated in a
grid system.  Thus, no individual electrical provider or transmitter can
guarantee that the electricity produced in its plant or transmitted across its
lines will be directed to a particular consumer or group of consumers or be
limited for distribution to a discrete geographic area.  New
 York, 535 U.S.
at 31-32 (Thomas, J., dissenting and concurring).  While we acknowledge
federal authority to govern this interstate electrical-transmission grid, we
conclude that Order No. 888 does not conflict with, but preserves, state
jurisdiction over the power to exercise eminent domain to site transmission
lines.  FERC Order No. 888 states that it does not affect state authority
“over local service issues, including reliability of local service.”  61 Fed. Reg. at 21,626 n.544. 
The rule further explains that “Congress left to the States authority to
regulate generation and transmission siting.”  Id.at 21,626 n.543.  The electricity that moves across
state lines is regulated by the federal government, but the transmission lines
and their supporting structures remain in Vermont and are subject to state
control.  See 30 V.S.A. § 2 (granting the Department of Public Service
supervision over “[s]iting of electric generation and
transmission facilities”).  There is no conflict between VELCO’s obligation under its FERC tariff to provide
nondiscriminatory access for the free-flowing transmission of electricity
across its transmission lines and the Board’s authority to approve the
necessity and siting of those lines.  Thus, we
conclude that federal law does not preempt the Board’s exercise of jurisdiction
in this case.  

¶ 19.         In a
related argument, the Grices claim that condemnation
of their land violates their rights under the Vermont Constitution.  The Grices rely on Tyler v. Beacher,
44 Vt. 648 (1871), wherein a mill owner sought to build and operate a grist
mill on Island Pond, and filed a condemnation action to flood his neighbors’
properties for this purpose.  On appeal, this Court held that the mill
owner could not use eminent domain to take his neighbors’ land because the mill
was purely for his personal benefit and because he was not required to serve
the public through its operation.  Id. at
655-56.  The Grices analogize Tyler to their
case and ask us to similarly hold that VELCO may not condemn their land because
the resulting transmission line will not be subject to state regulation.  

¶ 20.         We
conclude that the Board did not violate the Vermont Constitution in granting
VELCO condemnation of the Grice property for construction of the 345kV line.
 The Constitution allows appropriation of private land when necessary for
public use.  Vt. Const. ch. I, art. 2.  As
explained in Tyler,
to fit this standard the use must benefit the public and be subject to some
state control.  We do not read Tyler
as requiring the public use to be specifically regulated by state enactment in
every aspect of its operation to permit exercise of the power of eminent
domain. 

¶ 21.         This
interpretation is consistent with our previous statements defining public
use.  Following Tyler,
we explained that public use “appears from the character of the business, and
it is safely guarded for the obligation to serve all on equal and reasonable
terms, facilities, and accommodations.”  Rutland Ry.,
Light & Power Co. v. Clarendon Power Co., 86 Vt. 45, 54, 83 A. 332, 335
(1912).  Unlike the grist mill in Tyler,
whose owner had no obligation to serve the public, VELCO is a public-service
company authorized to provide energy transmission for the benefit of the public
and VELCO has an obligation under its charter to serve the public
interest.  “[A] corporation which engages in the business of generating
and distributing electric energy for general sale for power purposes devotes
its property to a public purpose as much as if it limited its business to the
sale of current for lighting purposes.”  Id. at 56, 83 A. at 336.  

¶ 22.         The Grices argue that VELCO’s
transmission services do not directly benefit individual Vermonters and do not
benefit all citizens, and that therefore the transmission is not a public
use.  In defining a public use, we have explained: “It is not necessary to
a public use that the whole public, or any considerable portion of it,
participate in it.  The use may be, and frequently is, limited to a small
locality, and yet be public in a constitutional sense.”  Deerfield
River Co. v. Wilmington Power & Paper Co., 83 Vt. 548, 553, 77 A. 862,
864 (1910).  The electrical power in the state passes through VELCO’s transmission lines.  Although VELCO does not
retail this power directly to consumers, no electricity could reach Vermonters
without passing through VELCO’s transmission
lines.  Thus, we conclude that condemnation of the Grice land is for a
public use and does not contravene the Vermont Constitution.

B.

¶ 23.         We
next address the Grices’ contention that the Board’s
order is flawed because it does not particularly describe the routes VELCO is
authorized to use to access the easement.  According to the Grices, their entire 319-acre farm is burdened in
perpetuity without a proper finding of necessity and without payment of
compensation because VELCO has the right to access the easement strip at any
location.  The Grices request that the order be
remanded for the Board to describe, condemn and order compensation for specific
access routes to the easement.  We conclude that the Board adequately
described VELCO’s rights to access the easement to
remove trees and to respond to emergencies.

¶ 24.         In a
petition for condemnation, a public utility corporation must “describ[e] the property or right” it wishes to
condemn.  30 V.S.A. § 111(a).  Generally,
the interest in land, including the principal right-of-way in the case of an
easement, “must be described with certainty and accuracy.”  Vt. Elec. Power Co. v. Anderson, 121 Vt. 72, 78, 147 A.2d 875, 879 (1959). 
The secondary right-of-access, however, may be “set forth in less precise
terms.”  Id.
at 78, 147 A.2d at 880.  The right-of-access need
not be expressly defined or limited because “[t]he creation of an easement or
right of way for an electric power line carries with it a reasonable right of
access to enable the utility to discharge its legal obligation to render
adequate and dependable service.”  Id.

¶ 25.         VELCO’s proposed easement included a clause granting VELCO
the right to enter the Grices’ property to cut or
trim trees outside the easement area if those trees interfered with the
easement area.  The proposed easement also granted VELCO the right to
enter and cross the Grice property to access the easement without permission in
the event of an emergency, but specified that VELCO was responsible for any
damage caused by such intrusion.  The Grices
complained that these clauses were overly broad and instead sought to identify
specific access points to the easement.  The Board rejected the use of specific
access points as impracticable.  The Board concluded that the right to
enter and cross the Grice property is “critical to all of VELCO’s
maintenance activities, including structure maintenance, pole testing, tree
trimming, brush control, line inspection, and any other work requiring VELCO to
access the right of way.”  The Board found that it was necessary for VELCO
to access the land without the landowner’s permission to “maintain the
reliability and safety of the line.”  

¶ 26.         The
Board’s finding of necessity is not clearly erroneous.  See In re Vt.
Elec. Power Co., Inc., 131 Vt. 427, 432, 306 A.2d 687, 690 (1973) (“Only
when we have reviewed the entire record and have been left with the definite
and firm conviction that a mistake has been committed will we hold a finding to
be clearly erroneous.”).  In addition, VELCO’s
petition adequately described the easement it sought and that the Board did not
err in declining to demarcate specific access routes to the easement.  As
explained in Anderson,
access routes to an easement need not be described in precise detail.  121
Vt. at 78, 147 A.2d at 880.  Here, the clauses strike an
appropriate balance between providing VELCO with the broad access that the
Board found was necessary, and also protecting the Grices
by stipulating that the access will be used only in emergencies and that VELCO
will compensate the Grices for any damage caused by
this access.

¶ 27.         Finally,
we are not persuaded by the Grices’ contention that
VELCO must, as part of the condemnation proceeding, identify and compensate
them for any land that will be used as an access route or any tree that will be
removed.  In support, the Grices cite Arkansas
Power & Light Co. v. Potlatch Forest, Inc., wherein the Arkansas
Supreme Court held that an electric company had to specifically describe and
condemn trees endangering transmission lines and the access routes to the
easement.  707 S.W.2d 317, 320 (Ark. 1986).  We find this case
unconvincing because we apply a different law pertaining to secondary easements
than in Arkansas. 
As described in Anderson,
we rely on the principle that secondary easements need not be described with
particularity—a concept that the court in Arkansas Power & Light Co.
specifically rejected.  

C.

¶ 28.         Finally,
we address the Grices’ request for attorney’s fees
and expert-witness costs.  The Grices claim they
are entitled to attorney’s fees because the condemnation action contravenes
their constitutional protection that “every person ought to obtain right and
justice, freely, and without being obliged to purchase it.”  Vt. Const. ch. I, art. 4.* 
According to the Grices, VELCO’s
litigation compelled them to “purchase” justice because they had to defend
against the condemnation proceeding.  The Grices
also argue that equity requires an award.  We conclude that there is no
basis either in law or in equity to award the Grices
attorney’s fees or expert-witness costs in this case.  

¶ 29.         We
adhere to the American rule that each party is responsible for its own
attorney’s fees absent an agreement or a statute authorizing a fee award. 
Monahan v. GMAC Mortgage Corp., 2005 VT 110, ¶ 76, 179 Vt. 167, 893 A.2d 298. 
In this case, no statute provides for an award of attorney’s fees to the Grices.  Although the trial court has discretion under
its powers of equity to award attorney’s fees, such deviation from the general
rule is only justified in exceptional cases.  Id. ¶¶ 75-76.  Equity does not
demand an award in this case; there is no evidence that VELCO acted in bad
faith to prolong the litigation or forced the Grices
to defend multiple actions.  See In re Gadhue,
149 Vt. 322, 328-30, 544 A.2d 1151, 1154-55 (1987) (granting fees where the
plaintiff was forced through defendant’s acts to undergo a second round of
litigation).

¶ 30.         Similarly,
there is no constitutional basis to award fees.  The right to justice
secured by Article 4 is violated if a party is precluded from seeking review of
a decision in court.  In re Stoddard, 144 Vt. 6, 8, 470 A.2d 1185,
1186 (1983).  Here, the Grices had full
access to the legal system and were not denied access to justice.  The
Board did not abuse its discretion in declining to award the Grices attorney’s fees.  

II.

¶ 31.         VELCO’s cross-appeal concerns whether it has authority to
install excess fiber-optic capacity along the easement.  The Board
concluded that VELCO needed only twenty-four fiber-optic wires to insure the
reliability of the new 345kV line and prohibited VELCO from installing any
excess fibers or from trading excess capacity.  VELCO argues that the
additional fibers are collectively so small that they will not additionally
burden the Grices’ land and therefore are not a
taking.  In the alternative, VELCO submits that a seventy-two-wire
fiber-optic line is reasonably necessary for the reliable operation of the
electrical-transmission system in the state and should be allowed.  We
conclude that the seventy-two-wire fiber-optic line may be installed as incidental
to and consistent with the primary use of providing a reliable
electrical-transmission network.  

¶ 32.         In
its condemnation petition, VELCO sought an easement that would allow it to
install excess fiber-optic capacity along the 345kV corridor.  The Board
denied VELCO’s request, explaining that VELCO could
not use its condemnation authority to take the Grices’
property for the purpose of installing telecommunications capacity beyond that
necessary for VELCO to provide adequate service.  VELCO also argued that
the excess capacity was necessary because it would be used to trade and obtain
the use of fiber-optic lines in areas of the state where VELCO does not have
any capacity and this use was necessary for the maintenance of those other
lines.  In response, the Board concluded that VELCO could simply purchase
lease rights from those companies and therefore trading was not
necessary.  In its clarification decision, the Board unambiguously
concluded that VELCO was authorized to install only twenty-four of the
requested seventy-two fibers and could not trade any excess capacity.  

¶ 33.         We
conclude that the Board’s interpretation of the statute’s requirements is
overly strict.  The Board’s interpretation essentially requires VELCO to
demonstrate that every aspect of its plan meets the public necessity and use
requirements specific to the improvements implemented at the precise location
of the condemned property.  We are not persuaded that the statute or the
Constitution require this result.  

¶ 34.         As
explained above, the Vermont Constitution limits the appropriation of private
land to those instances where the property will be used for a public
purpose.  This does not mean, however, that the condemning authority must
demonstrate how each detail of the project is necessary to serve the public use
when those uses are incidental to the public project.  Under our
public-utility condemnation law, the power to condemn is not invalidated even
if an incidental nonpublic purpose may also result from the taking, as long as
the substantial and primary purpose remains intact and the incidental benefit
“is a mere sequence” of the action.  Lucia v. Vill. of Montpelier, 60 Vt.
537, 545, 15 A. 321, 325 (1888).  In Lucia, Montpelier sought to condemn private property
to run an additional water-supply line from Berlin Pond.  The additional
water exceeded the residents’ specific water needs, but Montpelier explained that it required the
additional capacity in the case of a fire emergency or in case the primary
water main failed.  The town did not dispute that in the absence of such
an emergency, the excess water would be used for a different purpose—to create
power that could be sold.  On review, this Court concluded that Montpelier had authority
to condemn property to transport the additional water based on the primary
purpose of perfecting the town’s water supply, and any incidental benefit did
not invalidate this action.  Id.

¶ 35.         In
this case, we similarly conclude that VELCO’s primary
purpose of installing the OPGW is a public use because it is necessary for
maintenance of the line, and the incidental benefit of
having excess capacity to lease or trade does not invalidate the public
use.  Although we do not disagree with the Board’s finding that the excess
lines are not necessary for VELCO’s
maintenance of its electrical grid because the capacity in other parts of the
state could be purchased, there is also no evidence to contradict VELCO’s assertion that its purpose in acquiring the excess
capacity is to trade for capacity in other areas where VELCO does not have
fiber-optic wires.  As VELCO explains, the communications capacity it
derives will be used to further its public purpose of providing reliable
electrical service throughout the state.  This incidental benefit derives
from and does not interfere with the public use of the line.  Thus, the
benefit VELCO will accrue from this increased capacity is incidental to and
consistent with the line’s primary purpose of providing increased capacity and
reliability to the electrical-transmission network in the state.  

¶ 36.         We
caution that the doctrine of incidental benefit as it applies to these facts is
not a blanket authorization for a condemning authority under our public-utility
law to use its power of eminent domain to improperly serve private
interests.  The benefit is not incidental if the power of eminent domain
is “perverted to wrongful ends or diverted to wrongful uses.”  Id.; see Courchesne
v. Town of Weathersfield, 2003 VT 62, ¶ 12, 175 Vt. 585, 830 A.2d 118 (mem.) (explaining that if a town’s
action is primarily to serve a public purpose, an incidental private gain does
not invalidate the public purpose).  The only additional benefit accruing
in this case is to the condemnor, VELCO, and is incidental
to its statutory authority to condemn land when “necessary” to provide
“adequate service to the public in the conduct of its business.”  30 V.S.A. § 110.  Furthermore, while it is true, as the
Grices argue, that no more property may be condemned
“than would be necessary to accomplish purely the public component of the
project,” State ex rel. Wash. State Convention
& Trade Ctr. v. Evans, 966 P.2d 1252, 1258 (Wash. 1998), we disagree
that VELCO is taking more than it would need to accomplish its legitimate
propose.  As the Board found, VELCO must install an OPGW in the corridor
to maintain the safety and reliability of the network.  The only question
is whether VELCO can install twenty-four or seventy-two fibers within the
wire.  Installing seventy-two fibers in the OPGW increases the diameter of
the OPGW by a dimension nearly imperceptible to the naked eye, and does not
take any more property from the Grices than the OPGW
with twenty-four fibers.  The increased capacity and ability to trade
excess capacity generated from the seventy-two fibers does not expand the
taking and imposes no additional burden to the easement and therefore is
allowed as an incidental benefit to the public good served as the primary
purpose of the condemnation action.  

¶ 37.         Having
concluded that the seventy-two fiber-optic wire is de minimis
and may be installed as incidental to the primary purpose of the condemnation
action, we do not address VELCO’s additional
arguments supporting its installation.

The superior court’s
judgment is affirmed; the Public Service Board’s condemnation order is
affirmed, but the order is amended to allow VELCO to install seventy-two
fiber-optic wires and to trade excess capacity.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Chief
 Justice
 
  















*  The Grices also cite Articles 7 and 9 of the Vermont
Constitution, but do not explain how these provisions entitle them to
attorney’s fees; therefore, we do not address these arguments.  See Craven
v. McCrillis, 2005 VT 22, ¶ 8, 178 Vt. 476, 868 A.2d 740 (mem.) (declining to address issues that are inadequately briefed).